UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                              :
                                                    :         Chapter 11
    EAST 81st, LLC,                         :         Case No. 13-13685 (SMB)
                                                    :
              Debtor.                :
-------------------------------------------------------X

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## GRANTING MOTION TO DISMISS CHAPTER 11 CASE

**A P P E A R A N C E S:**

LAZARUS & LAZARUS, P.C.
*Attorneys for the Debtor and Debtor-In-Possession*
240 Madison Avenue, 8th Floor
New York, NY 10016

    Gilbert A. Lazarus, Esq.
        Of Counsel

GLEICH, SIEGEL & FARKAS, LLP
*Attorneys for Petermark II LLC*
36 South Station Plaza
Great Neck, New York 11021

    Jonathan H. Freiberger, Esq.
    Lara P. Emouna, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

        The Debtor, East 81st, LLC, currently owns several condominium units in a building located at 215 East 81st Street in Manhattan (the "Building"), and the units serve as collateral for a loan advanced by Petermark II, LLC ("Petermark"). Petermark has moved to convert or dismiss the case, or for relief from the automatic stay or

abstention. The Court conducted a two-day evidentiary hearing, and for the reasons that follow, grants the motion to dismiss the case.

## BACKGROUND

The Building was previously the subject of a condominium offering plan sponsored by the Debtors. (Petermark Exhibit ("PX") 4, at 1 (*Condominium Offering Plan for the 215 E. 81st Street Condominium* ("*Condominium Offering Plan*")).) It consists of 38 residential units and one professional unit,[1] (*id.*), and as stated, the Debtor owns six residential units (the "Residential Units") and the professional unit (the "Professional Unit"). The debtor owes Petermark approximately $4.5 million, plus additional legal fees, and Petermark's claim is secured by the Residential Units and the Professional Unit (sometimes collectively referred to as the "Petermark Units").

For several years prior to the bankruptcy filing, the Debtor was engaged in litigation with the condominium's Board of Managers (the "Board") and Petermark regarding numerous issues relating to its duties as the sponsor and its defaults under its loan agreement with Petermark. The state court initially appointed a receiver for the units owned by the Debtor in an action brought by the Board, and thereafter appointed the same person to act as receiver of the Petermark Units in the foreclosure suit commenced by Petermark.[2] The current receiver is Eric Anderson. Among other

---

[1]    The *Condominium Offering Plan* describes the condominium as consisting of one professional unit, but at times, the parties and their witnesses have referred to the same space as two professional units.

[2]    The order granting Petermark's motion to appoint a receiver (the "Receiver Order") is annexed as Exhibit C to Petermark's *Application in Support of Motion for an Order to Dismiss or Convert the Chapter 11 Proceeding to a Chapter 7 Proceeding Pursuant to 11 U.S.C.A. § 1112(B), or Alternatively, for an Order to Vacate*

2

things, the Receiver Order authorizes the receiver to market and lease the Petermark Units, collect a reasonable rental for their use and occupancy, and make such payments as may be necessary for common charges, taxes, necessary repairs or other fees and charges applicable to the Petermark Units.  In addition, the Receiver Order enjoins the Debtor, and its members, Yossi Zaga and Benzion Suky, from interfering with the receiver's possession.

On July 24, 2013, the state court signed a Judgment of Foreclosure and Sale relating to the Petermark Units, and the sale was scheduled for November 13, 2013.  On November 12, 2013, the Debtor filed this chapter 11 case, triggering the automatic stay and stopping the sale.  Aside from the units that it owns in the Building, the Debtor's only other property appears to consist of cash in the possession of the receiver.  The Debtor's schedules identify five creditors besides Petermark, and as discussed later, the Debtor lists only one liquidated unsecured debt in the sum of $166,272.78 owed to Goldberg & Rimberg PLLC, a law firm.[3]

Following the commencement of the bankruptcy case, the Court signed an order that, *inter alia*, excused the receiver from complying with Bankruptcy Code §543(a) and (b)(1), and authorized him to continue to act as the receiver of the Petermark Units.

---

the Automatic Stay Pursuant to 11 U.S.C.A. §362(d)(1), (2) and/or (3), or Alternatively, for an Order of Abstention Pursuant to 11 U.S.C.A. §305, filed Dec. 17, 2013 ("Petermark Application") (ECF Doc. # 16). The Debtor may have owned additional units covered by the receivership in the Board's lawsuit, but owned only the Petermark Units as of the Petition Date.

[3]     The Debtor's schedules and statement of financial affairs are annexed as Exhibit F to the *Petermark Application.*

3

(*Order Relating to Automatic Stay Under 11 U.S.C. § 362, and Turnover Under 11 U.S.C. § 543, with Respect to Prepetition Receiver*, dated Jan. 2, 2014 (the "*543 Order*") (ECF Doc. # 21).)  In addition, the instant motion sought to dismiss or convert the case, or, alternatively, for relief from the automatic stay and/or abstention pursuant to Bankruptcy Code § 305.  The portion of the motion seeking abstention was effectively mooted by the *543 Order*, which was itself a form of abstention.  *See* S. Rep. No. 95-989, at 85 (1978) ("Subsection (d) reinforces the general abstention policy in section 305 by permitting the bankruptcy court to authorize the custodianship to proceed notwithstanding this section.")  The gist of the balance of Petermark's motion is that the Debtor lacks equity in the Petermark Units or the ability to confirm a feasible plan within a reasonable time and Petermark's security interest is not adequately protected.[4] The Court tried the first two issues over two days.[5]

---

[4] Petermark cited six separate grounds to convert or dismiss the case under Bankruptcy Code §1112(b), including bad faith.  (*See Petermark Application* ¶ 78.)  The Court summarily rejected four of the grounds: gross mismanagement of the estate, misuse of cash collateral, failure to maintain insurance and disobedience of a court order.  Petermark's motion focused exclusively on the Debtor's pre-petition conduct  but the grounds for dismissal or conversion concern the Debtor's post-petition actions.  Moreover, the Receiver Order granted the receiver possession of the Petermark Units several years ago, and authorized the receiver to lease the vacant Petermark Units, collect the rent and pay the necessary expenses.  Since the Petition Date, and at Petermark's insistence, the receiver has managed the Petermark Units, collected all of the cash collateral and used it to pay the bills.  Hence, Petermark failed to show that the Debtor and its members have grossly mismanaged the estate, misused cash collateral, or failed to maintain insurance.  Similarly, while Petermark argued that the Debtor's members had disobeyed court orders issued by the state court, its application did not cite any instance in which they had disobeyed an order of this Court.

[5] The Court suggested that the parties first address the likelihood that the Debtor will be able to reorganize within a reasonable period of time.  This seemed the most straightforward.  Each side called its appraiser to give expert testimony regarding the rental value of the Professional Unit, an important question on this point, but also elicited their opinions regarding the market value of the Petermark Units.  Accordingly, the question of the Debtor's equity was also tried.

4

**A.     The Debtor's Equity**

   **1.     The Residential Units**

The six Residential Units comprise 4,097 square feet.  (*Appraisal Report of Six Residential Units and Commercial Unit*, dated as of Nov. 1, 2013 ("*Brunswick Appraisal*"), at 4.)[6]  Using the sales comparison approach which relied on the selling prices of comparable apartments in the Building and other buildings, Petermark's appraiser, Elinor Brunswick, opined that the market value of the Residential Units was $900 per square foot, rounded up to $3.7 million.  (*Brunswick Appraisal* at 47.)  Using the same valuation method, the Debtor's appraiser, Christophe Porsella, opined that the market value of the Residential Units was $1,141 per square foot, rounded up to $4.7 million.  (*Summary Appraisal of Six Residential Condominium Units & a Commercial Unit*, as of Dec. 20, 2013, at 30 ("*Porsella Appraisal*").)[7]

The appraisers primarily took issue with each other's adjustments to the selling prices of comparable apartments in the other buildings.  In this case, however, it is unnecessary to look beyond the Building itself because five apartments in the Building have been sold over the past two years.  The following chart summarizes the details of these sales as reflected in the appraisals:

---

[6]     The *Brunswick Appraisal* was received in evidence as PX 1.

[7]     The *Porsella Appraisal* was received in evidence as Debtor's Exhibit ("DX") A.  According to Porsella, the Residential Units comprised 4,137 square feet, or 40 square feet more than Brunswick stated.  (*See Porsella Appraisal* at 30.)  The difference is immaterial, and I will use 4,100 as the appropriate square footage.

5

| Apt. # | 4F | 6F | 5F | 7G[8] | 7F |
|---|---|---|---|---|---|
| Date of Sale | 1/30/2012 | 1/30/2013 | 4/22/2013 | 8/8/2013 | 8/23/2013 |
| Sale Price ($) | 557,000 | 568,000 | 500,000 | 540,000 | 585,000 |
| Sq. ft.[9] | 695 | 695 | 579 | 539 | 579 |
| Price per sq. ft. ($) | 801 | 817 | 864 | 1002 | 1010 |

Porsella's opinion of value ($1,141 per square foot) was based, in substantial part, on the two most recent sales in the Building as well as the sales in other buildings, but I conclude that it is overstated for two reasons. First, the in-Building sales do not support his opinion of value, and the Debtor did not supply any market data to show that the value of comparable condominium apartments has increased since April 2003. Second, five of the six Residential Units range in size from 713 square feet to 758 square feet, and are substantially larger than the two units sold in April 2003. (*See Brunswick Appraisal* at 21.) Porsella testified that smaller apartments sell for a higher price per square foot, and accordingly, the larger Residential Units would be expected to sell for less per square foot (though more in the aggregate) than the two April 2003 in-Building sales. (*Accord Brunswick Appraisal* at 54 (noting the inverse relationship between size and value "based

---

[8]  Brunswick omitted this sale from appraisal. She acknowledged the omission on cross-examination, but testified that it did not affect her opinion regarding value.

[9]  The Residential Units have small terraces of between 12 and 17 square feet. (*See Brunswick Appraisal* at 39.) Brunswick ascribed different square footage values to the interior space and the terrace, although she did not explain her method. In addition, she testified that she disregarded the terrace square footage in valuing the Residential Units, and it appears that Porsella followed the same approach. The square footage he listed for the two apartments that overlap with the *Brunswick Appraisal* (Units 5F and 7F) do not include the terrace area. (*Compare Porsella Appraisal* at 27 *with Brunswick Appraisal* at 39.) Accordingly, I will ignore the terrace and the lower price per square foot that Brunswick attributed to the terrace.

on the proposition established in the real estate market wherein, generally, other factors being equal, the larger the property size, the lower the unit price, or value and vice versa").)

On the other hand, Brunswick's $900 per square foot opinion is slightly low, in part because she did not consider the relatively recent sale in the Building that garnered a selling price of $1002 per square foot. Accordingly, I find that the value of the Residential Units is $950 per square foot, and the aggregate value of the six Residential Units is $3,895,000 rounded up to $3.9 million.

### 2. The Professional Unit

The Professional Unit covers 2,053 square feet.[10] (*Brunswick Appraisal* at 4.) It suffers from several drawbacks that affect its sale and rental value. Initially, zoning limits its use to a medical office or a school; it cannot be used as general retail space. It also needs substantial work. The space is partially finished and requires some construction work and painting. It lacks electricity (which must be brought in from the street), heating and air conditioning, and cost estimates to make the space usable have ranged from $100,000 to $100 per square foot (more than $200,000). The space is

---

[10] The appraisers disagreed on the size of the Professional Unit; Porsella stated that it covered 2,159 square feet, (*Porsella Appraisal* at 24), or 5% more than Brunswick's estimate of 2,053 square feet. No explanation was offered for the discrepancy. Nevertheless, Brunswick's estimate is consistent with the floor plan in the *Condominium Offering Plan* at page 311 (showing 2,055 square feet), and the flyer prepared by the Debtor's broker, Julie Friedman. (*See Market Rental Analysis of 215 East 81st Street Professional Unit (LA & LB)*, as of Nov. 1, 2013 ("*Brunswick Rental Analysis*") (PX 2), at 4 (stating that the unit consists of 2,053 square feet in addition to 682 square feet of storage space).) Accordingly, I credit Brunswick's statement of the square footage and reject Porsella's. The Professional Unit also includes 682 feet of storage space that lies beneath the unit and has limited accessibility. Neither appraiser attributed any value to it.

7

presently used by the condominium to store garbage and bicycles, and the bathroom is used by the Building doorman. If the Professional Unit is sold (or leased), someone will have to construct another bathroom in the Building for the doorman's use.

Access is also a problem, particularly for a medical office. The Professional Unit is below grade, and requires visitors to walk down several exterior steps to enter the premises. Moreover, there is no handicap exterior access. While the Professional Unit can also be accessed from the lobby, the Building has a part-time doorman, and there is no doorman from 8 a.m. to 10 a.m. and 6 p.m. to midnight.

Using the sales comparison approach, Brunswick appraised the value of the Professional Unit at $700 per square foot, or $1,437,100, rounded down to $1.4 million. (*Brunswick Appraisal* at 54.) Porsella opined that the value was $1,150 per square foot, or an aggregate value of $2,485,850 rounded up to $2.5 million.

I do not credit Porsella's valuation; he was unfamiliar with the previous efforts to sell the space, and when confronted with this history on cross-examination conceded that his valuation was overstated. The Debtor had hired Julie Friedman, a real estate broker, in September 2011 to sell or lease the Professional Unit. Over the course of the next eighteen months, she received what she considered to be three viable offers, two for $1.5 million and one for $1.512 million. She forwarded these offers to the receiver, he apparently failed to take any action, and none of the offers resulted in a sale contract. Nevertheless, the offers bolster Brunswick's opinion of value. When confronted with these facts, Porsella testified that he would lower his appraised value to between $1.5

8

million and $1.7 million. In addition, Porsella mistakenly believed that the Building had a full time doorman.

Accordingly, I find based on Brunswick's appraisal that the value of the Professional Unit is $1.4 million, and when the Residential Units are included, the value of the Petermark Units is $5.3 million.

### 3. The Liens

As noted, Petermark holds a lien in the approximate sum of $4.5 million, plus additional attorneys' fees which, as an oversecured creditor, it is entitled to add to its lien. *See* 11 U.S.C. § 506(b). Petermark's lien is not, however, the only lien. On July 29, 2010, Capital Construction Management ("Capital") obtained and docketed a judgment (the "Capital Judgment") in New York County against the Debtor in the sum of $899,792.[11] The Capital Judgment was partially satisfied, and the outstanding balance as of the Petition Date was $406,792 exclusive of post-judgment interest. (*Capital Construction Statement in Support of Petermark Motion*, dated Jan. 8, 2014, at ¶ 3 (ECF Doc. # 31).) Three years of interest at 9%, *see* N.Y.C.P.L.R. 5004 (McKinney 2007), would add another $110,000 to the pre-petition claim, and the number is actually higher because more than three years elapsed between the docketing of the Capital Judgment and the filing of the chapter 11 petition. Thereafter, on July 4, 2013, the Board obtained a judgment against the Debtor in the sum of $59,975.57 (the "Board Judgment") which

---

[11] A copy of the Capital Judgment is annexed as Exhibit C to the *Board of Managers Statement in Support of Petermark Motion*, dated Jan. 7, 2014 (ECF Doc. # 27).

was docketed in New York County on September 9, 2013 and remains unsatisfied.[12] Condominium units are considered real property under New York law, N.Y. Real Prop. Law § 339-g (McKinney 2006), and accordingly, the docketing of each judgment created a lien against the Petermark Units under N.Y.C.P.L.R. 5203(a) (McKinney 1997). *See Cadlerock Joint Venture, L.P. v. Bersson*, 958 N.Y.S.2d 340, 341 (N.Y. App. Div. 2013); *see generally* David D. Siegel, Practice Commentary C5203:4, 7B Civil Practice Law & Rules 5101-5500 at 113-14 (McKinney 1997); 11 JACK B. WEINSTEIN, HAROLD L. KORN AND ARTHUR R. MILLER, NEW YORK CIVIL PRACTICE CPLR ¶ 5203.03a[2], at 52-67 (2d ed. 2013). Finally, Petermark supplied evidence that the Petermark Units are subject to real estate tax liens aggregating approximately $300,000.[13] (*Petermark Application*, Ex. G.)

The three additional liens aggregate over $900,000, and when added to the Petermark lien, slightly exceed the market value of the Petermark Units.

**B.     The Likelihood of a Confirming a Plan**

According to Zaga, the Debtor's managing member, the Debtor's monthly expenses exceed its monthly rental income by between $14,000 and $17,000. (*See* PX 12.) In addition, he assumed that the Debtor received monthly income of approximately $3,000 relating to the rental of Unit 2D, but that unit is currently vacant. (*Petermark Application* at ¶ 17.) Thus, the monthly losses are actually between $17,000 and $20,000.

---

[12]  A copy of the Board Judgment is annexed as Ex. A to the *Anat Gilad Declaration in Support of Petermark Motion*, dated Jan. 7, 2014 (ECF Doc. # 28).

[13]  The Debtor's schedules did not list any tax debt.

The Debtor's plan for financial viability hinges on the renovation and renting of the Professional Unit which, as noted, will cost at least $100,000 and as much as $200,000. Even then, the cash flow projections prepared by Zaga (PX 12) are razor thin and do not account for any contingencies. Furthermore, Zaga conceded that the Debtor does not have the money to renovate the Professional Unit. Instead, it hopes to entice an investor to infuse capital pursuant to a plan of reorganization.

The proposed investor is Assa Properties ("Assa") whose vice president, Robert Lebensfeld, testified at trial. According to Assa's Letter of Intent, dated February 17, 2014 (DX H), Assa will acquire a membership interest and invest sufficient sums to renovate the Professional Unit and provide working capital, and on confirmation, pay 10% of the Petermark secured claim (totaling approximately $4.6 million) and 50% of the allowed unsecured claims (estimated to total $166,000). In addition, Assa will supply sufficient funds to make a balloon payment to Petermark after 120 months. Lastly, Assa or its designee will guarantee the monthly interest payments to Petermark and the monthly payments on the allowed tax priority claim to the extent that the monthly cash flow from operations does not generate enough to make these payments. Assa's willingness to invest is subject to due diligence, but Lebensfeld testified that due diligence has been completed. The principal area on which Assa and the Debtor's members still disagree is the percentage of ownership that Assa will acquire in the Debtor.

11

## DISCUSSION

Bankruptcy Code § 1112(b) directs a court to convert or dismiss a case for cause shown,[14] and contains a non-exclusive list of "causes." As stated in footnote 4, *supra*, the Court rejected several of the grounds cited in the *Petermark Application* because they were based on the Debtor's pre-petition conduct. Furthermore, we may skip over Petermark's charge that the Debtor filed this case in bad faith, and turn our attention to Bankruptcy Code § 1112(b)(4)(a) under which "cause" includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." Petermark, the movant, bears the burden of proving cause by a preponderance of the evidence. *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994); 7 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 1112.04[4], at 1112-22 (16th ed. 2013) ("COLLIER").

Petermark demonstrated that the Debtor has suffered substantial and continuing diminution to the estate since the Petition Date. Zaga's testimony confirmed that the Debtor has lost nearly $20,000 per month on a cash basis since the Petition Date, and this is not likely to change in the near future. A negative cash flow is sufficient standing

---

[14] Section 1112(b)(1) states, with exceptions that are not applicable:

. . . [O]n request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

Neither side has argued that the appointment of a chapter 11 trustee is an appropriate alternative to conversion or dismissal. Moreover, for the reasons discussed in the succeeding text, dismissal is the best alternative.

12

alone to establish continuing loss or diminution. *Loop Corp. v. United States Trustee*, 379 F.3d 511, 515-16 (8th Cir. 2004), *cert. denied*, 543 U.S. 1055 (2005); *In re 3868-70 White Plains Rd., Inc.,* 28 B.R. 515, 518 (Bankr. S.D.N.Y. 1983).

Petermark also demonstrated an absence of any likelihood of rehabilitation. "Rehabilitation "is not "reorganization," and the ability to confirm a liquidating plan does not demonstrate a likelihood of rehabilitation. 7 COLLIER ¶ 1112.04[6][a][ii], at 1112-28 to 29. Rehabilitation "signifies that the debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met." *See In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003).

Although the case is only four months old, it is a simple case with a straightforward business and financial structure. The Debtor owns seven condominium units. One of the Residential Units is currently vacant. The Professional Unit is presently not rentable at almost any price, and requires at least $100,000 to be put in a rentable condition, funds the Debtor lacks. The Debtor's units are not worth the debt they secure and have not generated enough cash to fund the Debtors' expenses, as evidenced by the failure to pay over $300,000 in real estate taxes. The Debtor has been negotiating with Assa for some time, and although Assa has completed due diligence and the only sticking point is the percentage of ownership it will acquire, the Debtor has thus far failed to file a plan.

Even if Assa were willing to invest in the Debtor, the Debtor's business would still not be viable. According to Zaga, assuming the Debtor could renovate and rent the

13

Professional Unit and all six Residential Units, the Debtor would eke out not more than $620.82 in positive monthly cash flow, excluding contingencies, vacancies (Unit 2D is now vacant) or servicing the two judgment debts. (*See* PX 12.) Furthermore, both Assa's Letter of Intent and Zaga's projections ignore the judgment liens which would have to be dealt with under a plan. Any Assa investment along the lines indicated in its Letter of Intent would merely fund marginal operations at best and continuing losses at worst rather than establish the Debtor as a viable business.

In short, the record shows that the Debtor is not capable of operating a profitable business that can generate enough cash flow to service its proposed plan payments to its secured and tax lien/priority creditors, cover ongoing operations (including real estate taxes) and ultimately, provide a dividend to its members. Accordingly, Petermark has demonstrated an absence of a reasonable likelihood of rehabilitation, and has demonstrated cause for conversion or dismissal under 11 U.S.C. § 1112(b)(4)(A).

Having found cause to convert or dismiss, the Court further concludes that dismissal rather than conversion is in the best interest of the creditors and the estate. The decision whether to convert or dismiss is committed to the Court's discretion. *Mitan v. Duval* (*In re Mitan*), 573 F.3d 237, 247 (6th Cir. 2009); *Reagan v. Wetzel* (*In re Reagan*), 403 B.R. 614, 620 (B.A.P. 8th Cir. 2009), *aff'd*, 374 F. App'x. 683 (8th Cir. 2010). This is a single asset real estate case bearing all of the hallmarks of a two-party dispute between the Debtor and its secured lender. In addition, two other creditors hold judgment liens that consume any possible equity in the Petermark Units. The schedules

14

list only three other creditors – the receiver, Goldberg & Rimberg and a California chapter 7 trustee – and liquidated unsecured debt amounting to slightly more than $166,000. Most important, there are no assets for a chapter 7 trustee to recover for the benefit of the unsecured creditors, and no estate to administer; if the case is converted, Petermark will doubtless pursue relief from the stay to foreclose on its collateral based, *inter alia*, on the Debtor's lack of equity in the property and the absence of any possibility of a reorganization. *See* 11 U.S.C. § 362(d)(2). Finally, all of the issues relating to the claims of Petermark, the Board and Capital Construction have been resolved by the state court, and there is nothing for this Court to decide.

The foregoing constitutes the Court's findings of fact and conclusions of law. In light of the disposition of the motion to dismiss, the Court does not reach Petermark's request for alternative relief. Settle order on notice to the Debtor, all creditors and the United States Trustee.

Dated:   New York, New York
         March 17, 2014

                                        /s/ *Stuart M. Bernstein*
                                        STUART M. BERNSTEIN
                                        United States Bankruptcy Judge